IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAMIE HARTMAN,** | ) | CIVIL ACTION NO. 2:21-cv-594 |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **MCKAMISH, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**COMPLAINT**

**I.     PRELIMINARY STATEMENT**

By this action, Plaintiff, Jamie Hartman, seeks lost wages and benefits, compensatory and punitive damages, costs, and attorney's fees because Defendant, McKamish, Inc., terminated her employment because of her sex, disability, and in retaliation for her complaints of discrimination based on the preceding protected classes, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*  Plaintiff also seeks lost wages and benefits, liquidated damages, costs, and attorney's fees because Defendant terminated her employment because of her age and in retaliation for her complaints of age discrimination, in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq*.  Additionally, Plaintiff seeks lost wages and benefits, liquidated damages, costs, and attorney's fees as a result of being terminated by Defendant in retaliation for her requests for leave under the Family and Medical Leave Act and because Defendant interfered with her FMLA rights.  Defendant's actions in this regard violated 29 U.S.C. § 2601 *et seq*.  Finally, Plaintiff seeks lost wages and benefits, compensatory and

1

punitive damages, costs, and attorney's fees because Defendant wrongfully discharged her in violation of Pennsylvania's public policy.

## II.     JURISDICTION

1. This Court has jurisdiction of this matter by virtue of 28 U.S.C. § 1331, in that this is a civil action wherein the matter in controversy arises under the laws of the United States.

2. This Court also has jurisdiction of this matter under 28 U.S.C. § 1367, in that this is a civil action of which this Court has original jurisdiction, and one of Plaintiff's claims is brought under Pennsylvania state law, which is related to the federal claims in this action in that they form part of the same case or controversy under Article III of the Constitution of the United States.

3. Venue is proper in this judicial district under 28 U.S.C. § 1391(b), in that this is a civil action in which jurisdiction is not founded solely on diversity of citizenship, and the acts constituting a substantial part of the events and omissions giving rise to the claims occurred in the Western District of Pennsylvania.

4. On December 14, 2020, Plaintiff filed a Charge of Discrimination with the EEOC against the Defendant. On March 12, 2021, the EEOC issued a Notice of Right to Sue to Plaintiff.[1]

## III.     PARTIES

5. Hartman is an adult individual who resides at 316 Poplar Street, Tarentum PA 15084. At the time of the incident complained of in this lawsuit and presently, she was and is a citizen of the Commonwealth of Pennsylvania and the United States of America.

---

[1] Once the administrative requirements have been exhausted, Plaintiff intends to amend this Complaint to include six additional counts under the PHRA.

6. McKamish, Inc. is a Pennsylvania corporation that operates as a mechanical construction company. Its headquarters are located at 50 55th Street, Pittsburgh PA 15201.

## IV. STATEMENT OF CLAIM

6. Hartman was born on November 4, 1970.

7. In July 1998, Hartman began her employment with Defendant as a sheet metal worker, primarily working in the run through process that involved the forming of sheet metal.

8. Hartman suffers from multiple sclerosis, which was diagnosed in August 2018.

9. Shortly after that diagnosis, Hartman informed her Foreman, James Deshong, of her disability. Deshong was very understanding about Hartman's disability, as his wife was also diagnosed with multiple sclerosis.

10. In the spring of 2019, Hartman requested a bathroom to be placed on the same level as her workplace as an accommodation. Defendant granted that request.

11. In the winter of 2019, Deshong announced his retirement. Richard Moore, one of Defendant's Superintendents, was tasked with finding a replacement.

12. During a conversation with Moore, he informed Hartman that he selected Daniel Haluck to replace Deshong. According to Moore, he selected Haluck because Haluck is an "alpha male."

13. In addition to being an "alpha male," Haluck is significantly younger than Hartman.

14. The "alpha male" comment surprised Hartman, but Moore's selection of a younger individual did not. Moore often spoke of his preference for youth when deciding whom to promote.

15. On March 12, 2020, Hartman attended a meeting with Moore for what she believed was to be a discussion about Defendant's EEO policies.

16. Instead of discussing those policies, Moore started the meeting by asking how Hartman was doing. He then made a comment about how HIPAA laws prevented him from saying certain things about Hartman's health information.

17. Confused by the direction of this meeting, Hartman responded that she was doing "OK."

18. Moore then brought up the fact that Defendant had installed a bathroom on the ground floor for Hartman as an accommodation (when Hartman originally received this accommodation, Moore commented that she could have just used a self-catheter).

19. During the same meeting, Moore reminded Hartman that Defendant is a construction company and said that he was not sure what else Defendant could do for her as an accommodation. These comments confused Hartman, as she was not asking for another accommodation.

20. Moore then informed Hartman that her coworkers were reporting that she could not physically do her job anymore.

21. Hartman responded that those reports were untrue and, feeling as if she were under attack, began to cry and told Moore that she felt it was wrong that Haluck had been promoted. She explained that Jay Groom should have been promoted to Foreman, which would have moved Hartman into the position of Sub-Foreman.

22. Sub-Foreman was a position that Hartman had experience with because she held it whenever the full-time Sub-Foreman was absent.

23. Hartman also informed Moore that she felt his actions were discriminatory based on his "alpha male" and ageist comments. Moore did not respond to her concerns.

4

24. On March 13, 2020, Moore met privately with Haluck and Groom.

25. Following that meeting, Hartman's cordial working relationship with Haluck changed dramatically, as Haluck refused to speak to her. Additionally, Hartman was never again assigned to fill in as the Sub-Foreman.

26. It is Hartman's understanding that Moore also joked to Eric Haines, Field Foreman, about her crying and said that he would like to "get rid" of her but did not know how to do so without getting in trouble.

27. With the arrival of the COVID-19 pandemic, Defendant laid off several employees, including Hartman, due to a lack of work.

28. When Defendant recalled its employees, Hartman was the last one to be brought back. She returned on May 11, 2020.

29. Hartman questioned Moore why she was last and asked him whether retaliation was the cause. Moore told Hartman that it was not retaliation but her "health issues" that led him to recall her last.

30. Following that recall, Haluck continued to not speak to Hartman, and he also failed to train her on new machines that Defendant installed, including the snaplock, drive, and 3/8 edger machines

31. Hartman began to fear for her job as a result of Haluck's behavior and Moore's comments about her disability.

32. At this time, Hartman also had to regularly attend medical appointments and had intermittent absences due to flare-ups of her disability. These absences caused Hartman concern for retaliation from Defendant.

33. In July 2020, Hartman applied for intermittent FMLA leave for her time off to be protected.

34. Shortly after she submitted her paperwork to Defendant, Moore told her that Defendant was not responsible for processing her FMLA leave request and claimed that it was her union's responsibility.

35. Hartman responded that her FMLA leave request was to protect her job so that Moore could not use her absences against her. Moore repeated that Hartman had to speak to her union because Defendant's management said that it was not in charge of overseeing her FMLA leave.

36. On August 24, 2020, Hartman met with Jennifer Liokareas, Defendant's Human Resources Manager, in further pursuit of her FMLA leave request.

37. Liokareas informed Hartman that Defendant had nothing to do with her FMLA leave and, like Moore, directed her to contact her union.

38. During this meeting, Hartman expressed her concern that Moore would hold her absences against her. Liokareas responded that Hartman should not worry because David McKamish would protect her.

39. Hartman also told Liokareas that she felt that Moore was discriminating against her, relayed his "alpha male" comment, explained how he favored promoting younger men, and described not being trained on the new machines.

40. In response, Liokareas claimed that Moore's comments were probably just an example of how men use the wrong words to convey messages and told Hartman not to worry about the lack of training on the new machines because it probably just stemmed from insufficient communication.

41. On August 25, 2020, Hartman met with Liokareas again, who told Hartman that she would talk to Marc Mushnock, Operations Manager, about training on the new machines.

42. Hartman asked Liokareas about her discrimination complaint, and Liokareas said that Hartman would have to meet with Kevin McKamish, Controller and EEO Officer.

43. On August 27, 2020, Hartman met with Kevin McKamish and Liokareas and again expressed her concerns about Moore's biases. She also told them that she was afraid to miss work due to her disability because she felt that her absences would be used against her. Finally, she told them that she felt as though she was being targeted for termination.

44. In response, both individuals reassured Hartman that her job was not in jeopardy.

45. Following that meeting, members of Defendant's management met with Moore to discuss his discriminatory comments, and it is Hartman's understanding that Moore denied any wrongdoing.

46. As a result of his denial, Hartman was asked several times to provide the names of witnesses to his comments.

47. On September 17, 2020, Hartman met with Mushnok and Liokareas, at which time they informed Hartman that she was to sit down with Haluck, Groom, and Dennis Rosencrance, Shop Steward, in order to resolve alleged communication issues. Mushnok instructed her not to bring up any of her issues with Moore during her meeting with those individuals.

48. In response to Muchnok's instruction, Hartman described how Moore was the cause of the problems because of his conversation with Haluck that led to Haluck's subsequent coldness towards her.

49. Mushnok told Hartman again to forget about Moore for that meeting and asked her to repeat her discrimination concerns, again pressing her for names of witnesses.

50. Hartman repeated her concerns but, out of fear that her colleagues would be retaliated against, told Mushnok that she would ask the witnesses for their consent before

providing their names. Mushnok told her that he would consider the matter to be closed if she did not identify any witnesses.

51. On September 21, 2020, Hartman met with Haluck, Groom, and Rosencrance.

52. During this meeting, she was told not to question Haluck's and Groom's decisions. Haluck also said that Defendant was doing its best to work around Hartman's medical appointments and absences but that she was excluded from filling in as Sub-Foreman because they needed someone reliable.

53. On October 5, 2020, Hartman met with Mushnok and Liokareas again, and Mushnok told Hartman that she had to provide the names of witnesses by October 9, 2020.

54. That same day, Hartman discussed at a safety meeting, for the benefit of Defendant's newer employees, the importance of filling out an accident report when a workplace injury occurred.

55. On October 9, 2020, Hartman called Mushnok, instead of meeting with him, because she was not at work that day due to a medical procedure. Hartman told Mushnok that she could not provide the names of witnesses because they had not consented. Mushnok indicated that he understood her concerns.

56. On October 12, 2020, shortly after Hartman arrived at work, Haluck told Hartman that Defendant was laying her off due to a lack of work. According to him, the layoff was effective on October 9, 2020 but Hartman was not informed that day due to her absence.

57. Hartman found out that two other individuals, Jeffrey Eyer and Matthew Vinski, had also been laid off that week. Those individuals were notified on October 8, 2020 that their last day would be October 9, 2020.

58. Importantly, Hartman was also at work on October 8, 2020 but was not informed of her layoff until the deadline to produce witnesses had passed.

59. Unlike prior layoffs that Hartman had experienced while working for Defendant, including the initial closure due to the COVID-19 pandemic, Defendant required her to pack up all her tools and escorted her off its premises. In the past, when layoffs occurred, Hartman's tools remained on Defendant's premises and an escort was not required.

60. The two other individuals laid off that week were not escorted out.

61. Despite being one of the most experienced members of her department, Defendant chose Hartman to lay off, while retaining multiple individuals with less experience than her.

62. Mark Mange, Hartman's replacement in the run through process, is a less-experienced male, who, upon information and belief, did not engage in protected activity, does not have a disability, did not make a request for FMLA leave contemporaneous to Hartman's, and did not make comments that Defendant construed as relating workers' compensation.

63. Following Hartman's layoff, she had a conversation with Gregory Blose, Business Manager of Sheet Metal Workers Local Union No. 12, regarding Defendant's actions.

64. During that conversation, Blose told Hartman that approximately a week before her layoff, he was on a conference call with Moore, David Wingertsahn, Project Manager, and possibly Mushnok, during which she was the topic of conversation.

65. Defendant's representatives on the call with Blose indicated that Hartman had discussed workers' compensation at a recent safety meeting, and they were afraid she was going to pull something in terms filing a claim against Defendant. They then indicated to Blose that they were going to handle that issue internally.

66. As a result of Defendant's conduct, Plaintiff has suffered substantial mental anguish, emotional distress, and economic damages.

## V.     CLAIMS FOR RELIEF

### COUNT I – VIOLATION OF ADA – TERMINATION

67.     Plaintiff incorporates by reference the averments contained in all preceding paragraphs as if fully set forth herein.

68.     Defendant has intentionally and willfully engaged in a series of unlawful acts in discriminating against Plaintiff with respect to compensation, terms, conditions, or privileges of employment in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*.

69.     Defendant's decision to terminate Plaintiff was induced by its intent to discriminate against Plaintiff based on her disability and/or perceived disability.

70.     Plaintiff has been directly harmed as a result of Defendant's violations as is fully set forth above.

### COUNT II – VIOLATION OF ADA – RETALIATION

71.     Plaintiff incorporates by reference the averments contained in the previous paragraphs as if set forth fully herein.

72.     Defendant intentionally retaliated against Plaintiff, in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*.

73.     Defendant's decision to terminate Plaintiff was induced by its intent to retaliate against Plaintiff because of her protected activity.

74.     Plaintiff has been directly harmed as a result of these violations as is fully set forth above.

### COUNT III – VIOLATION OF TITLE VII – TERMINATION

75.     Plaintiff incorporates by reference the averments contained in all preceding paragraphs as if fully set forth herein.

76. Defendant has intentionally and willfully engaged in a series of unlawful acts in discriminating against Plaintiff with respect to compensation, terms, conditions, or privileges of employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

77. Defendant's decision to terminate Plaintiff was induced by its intent to discriminate against Plaintiff based on her sex.

78. Plaintiff has been directly harmed as a result of Defendant's violations as is fully set forth above.

### COUNT IV – VIOLATION OF TITLE VII – RETALIATION

79. Plaintiff incorporates by reference the averments contained in the previous paragraphs as if set forth fully herein.

80. Defendant intentionally retaliated against Plaintiff, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

81. Defendant's decision to terminate Plaintiff was induced by its intent to retaliate against Plaintiff because of her protected activity.

82. Plaintiff has been directly harmed as a result of these violations as is fully set forth above.

### COUNT V – VIOLATION OF ADEA – TERMINATION

83. Plaintiff incorporates by reference the averments contained in all preceding paragraphs as if fully set forth herein.

84. Defendant has intentionally and willfully engaged in a series of unlawful acts in discriminating against Plaintiff with respect to compensation, terms, conditions, or privileges of employment in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq*.

85. Defendant's decision to terminate Plaintiff was induced by its intent to discriminate against Plaintiff based on her age.

86. Plaintiff has been directly harmed as a result of Defendant's violations as is fully set forth above.

### COUNT VI – VIOLATION OF ADEA – RETALIATION

87. Plaintiff incorporates by reference the averments contained in the previous paragraphs as if set forth fully herein.

88. Defendant intentionally retaliated against Plaintiff, in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq*.

89. Defendant's decision to terminate Plaintiff was induced by its intent to retaliate against Plaintiff because of her protected activity.

90. Plaintiff has been directly harmed as a result of these violations as is fully set forth above.

### COUNT VII – VIOLATION OF FAMILY AND MEDICAL LEAVE ACT – INTERFERENCE

91. Plaintiff incorporates by reference the averments contained in the previous paragraphs as if set forth fully herein.

92. Defendant interfered with Plaintiff's FMLA rights, in violation of 29 U.S.C. § 2615(a)(1).

93. Plaintiff has been directly harmed as a result of these violations as is fully set forth above.

### COUNT VIII – VIOLATION OF FAMILY AND MEDICAL LEAVE ACT – RETALIATION

94. Plaintiff incorporates by reference the averments contained in the previous paragraphs as if set forth fully herein.

95. Defendant intentionally retaliated against Plaintiff, in violation of 29 U.S.C. § 2615(a) and 29 C.F.R. § 825.220(c).

96. Defendant's decision to terminate Plaintiff was induced by its intent to retaliate against Plaintiff because of her desire to take FMLA leave.

97. Plaintiff has been directly harmed as a result of these violations as is fully set forth above.

### COUNT IX – VIOLATION OF PENNSYLVANIA'S PUBLIC POLICY – TERMINATION

98. Plaintiff incorporates by reference the averments contained in the previous paragraphs as if set forth fully herein.

99. Defendant has intentionally and willfully engaged in a series of unlawful acts in violation of Pennsylvania's public policy.

100. Defendant's decision to terminate Plaintiff was induced by its intent to prevent her from filing a claim under Pennsylvania's Workers' Compensation Act.

101. Plaintiff has been directly harmed as a result of these violations as is fully set forth above.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Honorable Court will:

(a)     Assume jurisdiction herein;

(b)     Declare Defendant's conduct to be unlawful and an intentional violation of Plaintiff's rights;

(c)     Award Plaintiff wage loss damages, including back pay, front pay, and lost future earnings, damages associated with the increased tax burden of any award, and lost fringe and other benefits of employment;

(d)     Award Plaintiff liquidated damages under the FMLA and ADEA;

(e)     Award Plaintiff compensatory and punitive damages under Title VII, the ADA, and for Defendant's violation of Pennsylvania's public policy;

(f)     Award Plaintiff pre- and post-judgment interest;

(g)     Award Plaintiff costs and attorney's fees; and

(h)     Grant such other relief as the Court deems just and appropriate.


**JURY TRIAL DEMANDED**                              Respectfully Submitted,

/s/ Nicholas W. Kennedy
Nicholas W. Kennedy
PA ID No. 317386
QuatriniRafferty
550 East Pittsburgh Street
Greensburg, PA 15601
Phone: 724-837-0080
Fax: 724-837-1348